CRanch, J.
As to the first exception, I am of opinion that the jurisdiction over this district, vested in Congress on the 1st Monday of December, 1800, the day on which, by law, the district became the seat of government. That the crime was therefore an offence against the United States, and committed within the jurisdictioti of this Court.
The second section of the Act of Cession, passed by the Legislature of Virginia, on the 3d of December, 1789, is in these words, viz., “ That a tract of country not exceeding ten miles square, or any lesser quantity, to be located within the limits of this state, and in any part thereof, as Congress may by law direct, shall be, and- the same is hereby forever ceded and relinquished to the Congress and government of the United States, in full and absolute right and exclusive jurisdiction, as well of soil as of per *16 sons residing, or to reside thereon, pursuant to the tenor and effect of the 8th section of the 1st article of the Constitution of government of the United States.” That article has the following words: “ The Congress shall have power to exercise exclusive legislation over such district, not exceeding ten miles square, as may, by the cession of particular States, and the acceptance of Congress, become the seat of the government of the United States.”
The jurisdiction ceded by.Virginia could not, vest or take effect until Congress should be able, constitutionally, to exercise it; which they could not do, under the article of the constitution referred to by the act of cession, until the district should become the seat of the government of the United States.
The act of cession, by referring to the constitution, must be understood to mean, that Virginia ceded a jurisdiction which was to vest, or take effect when the district ceded should become the seat of government. The “ tenor and effect” of that section of the constitution is, that Congress should immediately, upon taking possession of its permanent seat, have the sole and exclusive jurisdiction over it; and the cession is expressly stated to be according to that “ tepor and effect.”
It seems clear that Virginia did not part with her jurisdiction until Congress could exercise it, which, by the Constitution, could not be until the district became the seat of the government.
On the first Monday of December, 1800, the District of Columbia, by law, and in fact, became the seat of the government of the United States. The words of the second section of the Act of Cession could not well be stronger or more effective than they are. The tract of country which Congress should locate, was “ thereby forever ceded and relinquished to the Congress and Government of the United States in full and absolute right and exclusive jurisdiction as well of soil as of persons residing and to ide thereon.”
/"Before this right of exclusive jurisdiction could absolutely vest in the United States, it was necessary, by the Act of Cession, and by the eighth section of the first article of the Constitution of the United States, that three events only should happen : 1st. That ihe cession should be accepted by Congress. 2d. That it should be located and defined ; and 3d, That the district so accepted, located, and defined, should become the seat of government of the United States. All these events had happened on the first Monday of December, 1800, being the day appointed by law for the removal of the seat of government. On that day, therefore, all the preliminary events having happened, the District of Columbia became vested in the Congress and Government of the *17 United States, according to the impressive words of the Act of Cession, “ in full and absolute right and exclusive jurisdiction as well of soil as of persons residing or to reside thereon.”/ There can be no doubt in this case, if the fourth section of the Act of Cession does not control the general expressions of the second section. Let us then consider what is the effect and operation of the fourth section. Here it becomes necessary to recollect the legal rules of construction which are applicable to statutes and grants; one of which is, that the exception from the general terms of a grant shall be construed strictly. Another is, that in the same instrument or the same statute, the same words are supposed to mean the same thing, and different words not necessarily conveying the same idea, are supposed to mean different things. No repugnancy or absurdity shall be presumed, especially in a statute, if the words will bear such a construction as to avoid it. All instruments and statutes shall be so construed, ut res magis valeat, quam pereal.
Statutes being written with much caution, and enacted with great solemnity, every word is supposed to have been maturely considered, and to have an appropriate meaning. An act by which a State parts with a portion of its territory and jurisdiction, is one of the most important acts which a 'State can perform. It is an act which cannot, like the ordinary acts of legislation, be repealed, and we are therefore to presume that the legislature would be peculiarly cautious in the selection of words to express its meaning.
The general expressions of the second section of the Act of Cession are, in some measure, affected by the proviso contained in the fourth section, which is in these words, viz.: “ Provided that the jurisdiction of the laws of this Commonwealth over the persons and property of individuals residing within the limits of the cession aforesaid, shall not cease or determine, until Congress, having accepted the said cession, shall by law provide for the government thereof, under their jurisdiction, in manner provided by the article of the constitution before recited.”
We have before seen that by the second section of the Act of Cession, the jurisdiction was to vest in Congress as soon as they should constitutionally become competent to exercise it, which period has, by subsequent events, been ascertained to be the first Monday of December, 1800.
If the expression in the proviso, “jurisdiction of the laws of this Commonwealth over the persons and property of individuals,” is supposed to include the whole idea of “ full and absolute right and exclusive jurisdiction,” which is ceded by the second section, then the legislature would in effect say, that we cede to the Congress and Government of the United States a certain district, the *18 full and absolute jurisdiction over which shall vest in Congress as soon as the said district shall become the seat of the - government of the United States; provided, nevertheless, that the said jurisdiction shall not vest on the happening of that event, but on a subsequent act which is to be done by Congress, under, and by virtue of, the jurisdiction which we transfer. The absurdity of this construction is evident, and we must from thence infer that the expression, “jurisdiction of the laws over the persons and property of individuals,” was not intended to convey the same idea as the former expression, “ full and absolute right and exclusive jurisdiction as well of soil as of persons.”
It must be evident that the expression in the fourth section is far iess comprehensive than that in the second. The terms “ full and absolute right and exclusive jurisdiction as well of soil as of persons,” comprehend the whole complex idea of sovereignty; but the expression, “jurisdiction of the laws over the persons and property of individuals,” conveys only a part of that idea. There is certainly a difference between the whole sovereign authority of an independent state, which comprehends the political as well as legislative or municipal jurisdiction, and the simple effect, of the laws enacted under and by virtue of its municipal or legislative power. When a State, possessed of sovereign authority, transfers to another State a part of its territory, in full and absolute right and exclusive jurisdiction, as well of soil as of persons residing or to reside thereon, it parts with its whole rights of sovereignty over such portion of its territory. It may, if it chooses, stipulate that the laws which were the rules of conduct in such portion of territory at the time of its cession, shall continue in force, as rules of conduct, until altered by the Slate to which the territory is transferred ; but in such case, those laws would not derive their obligatory force from the continuance of the jurisdiction of the former sovereign of the territory, but from the compact between the two sovereign States, by which they became the laws of its new sovereign.
The proviso in the fourth section appears to me-to be nothing more than a stipulation that the laws of Virginia, as they should, exist at the time of the actual transfer of the- jurisdiction, should remain in force as law, until Congress should otherwise provide, under their- jurisdiction. Virginia has stipulated,' and the United States by their act of acceptance have assented; it is a 'mere matter of compact between two sovereigns having full power .to contract upon that subject. The jurisdiction of-the-laws, can mean nothing more than the operation of the laws ; and so it was understood by Congress, who, in their act of acceptance, have said, “ Provided that the operation,of the laws of the State within *19 such district shall not be affected by this acceptance, until the time fixed for the removal of the government thereto, and until Congress shall otherwise by law provide.”
What then is the operation of a law ? A law is always in operation as long as it is thé rule of conduct of the subject upon which it is intended to operate ; that is, as long as the subject is bound to obey it, or conform his conduct to its provisions. The operation of a law can be nothing more than the obligation of a law. A law ceases to operate when it is no longer obligatory, and as long as it is obligatory it is in full operation. The laws would not cease to operate upon the citizens of a State, although it should happen that there was neither a court, a judge, or an officer of justice to punish a breach of those laws.
In England it was formerly the case that upon every demise of the crown, every commission of every officer of justice expired ; but it was never suggested that the operation of the laws was in any degree affected thereby. There is a great difference between the operation of the law’s, and the execution of the laws. A law may be in operation, and yet from a defect'of courts or officers of justice, it may not be possible to carry it. into execution. The operation of a law is a part of its very essence. It ceases to be a law when it. is no longer operative. Congress may pass an act whose operation may commence on a future day, but until that day arrives it does not become a law', it is only an act which at a future day is to become a law. If, in the mean time, beforq its operation commences, a person does an act which would be contrary to that Act of Congress if committed after the time limited for its commencement, still that person commits no crime, no offence, and has done nothing against law.
If Congress should pass an act, and declare that the operation of that act should commence on the first day of January next and continue until the first day of July following, it would not become a law until the first of January, and it would cease to be a law on the first of July. Operation, therefore, is an essential quality of ■ every law, and means no more than the moral power, or obligation of a law, or that quality by which the law becomes binding, ■upon a man as a rule of his conduct. :
. • If,, then, the jurisdiction of the law's means the operation of the laws, if-the operation of the laws is simply their moral power 'or obligatory quality, and if those law's derive their binding force or obligation, not from any remnant of the jurisdiction of Virginia, but from* the Act of Congress by which that stipulation was agreed to, then it will follow that the jurisdiction of the laws' of Virginia may not cease or determine, and yet Virginia may have parted with every shred of jurisdiction over the territory..
*20 But it has been said, that if we take the laws of Virginia, we must take their courts and their officers of justice also. I consider it unnecessary to give an opinion on that subject, as in the case now before the court it will be sufficient if we show that the jurisdiction over this district was vested in Congress on the 26th oi February, 1801. But it may well be doubted whether the courts or officers of justice constitute any part of the laws of Virginia, or of their jurisdiction or operation, within the meaning of the term laws, as used in the Act of Cession and acceptance. It is even doubtful whether an act of assembly constituting a court, is properly speaking a legislative act, or can be called a law. It seems-more like a charter or grant. The appointment of judges and other officers is certainly not a legislative act, nor would it become so by being made by a legislative body.
It has been said also that as the jurisdiction of the laws of Virginia was not to cease or determine, so the powers of the courts, judges, and other officers of justice must continue and be cooperative, or the laws could not operate. But I trust I have already shown that the operation of the laws does not depend upon the existence of courts or officers of justice, whose only business is to enforce the execution of the laws.
The reasons of inserting the fourth section in the Act of Cession, seems to have been that the inhabitants of this district shoyld not be without laws, from the time of the transfer of the jurisdiction, until Congress should have leisure to frame a body of laws for their government.
It was foreseen that as soon as the District of Columbia should become the seat of the government, the operation of the laws of Virginia must cease. It might be supposed that it would take Congress a long time to form a complete system, but it would not take many days to erect a court and establish the necessary offices for carrying those laws into effect. There was therefore little or no reason for withholding the jurisdiction, if the operation of the laws could be continued consistently with its transfer. That the Legislature of Virginia thought this might be done appears from the expressions in the fourth section,/' until Congress, having accepted the said cession, shall, by law, provide for the government thereof under their jurisdiction, in manner provided by the article of the Constitution,” &c.
By the Constitution, Congress could not exercise exclusive legislation over the district until it had become the seat of government. Congress must have the jurisdiction before they could constitutionally pass a law “ under ” that jurisdiction. Or if Congress had, before its removal to the district, passed an act for its government to become operative when it should .become the seat of *21 government, still the jurisdiction must vest before the act could be of effect; so that the vesting of the jurisdiction could not be the consequence of such an act.
I must confess that when this question was first suggested, I was inclined to think that the jurisdiction of Virginia did not cease until the passing of the Act of Congress on the 27th of February, 1801. But upon an accurate comparison of the Act of Cession with the Constitution and the act of acceptance, I am clearly of opinion that the jurisdiction was completely vested in Congress on the first Monday of December, 1800.
As to the second reason alleged in arrest of the judgment, viz., that the indictment does not conclude against any statute, it seems to be without foundation. I have no doubt that an indictment at common law is good. It was urged that the common law was, by the Convention in 1776, declared to be in force in Virginia until it should be altered by Act of Assembly; and it was contended that it had been altered in this case by that Act of Assembly which authorizes a punishment for larceny different from that which the common' law inflicted. But that act contains no negative words by which the common law punishment is excluded, and I think the common law cannot be altered without such negative words. \
As to the third exception, namely, that there was no previous court of examiners, I imagine it is a fact out of the record, and which cannot be alleged in arrest of judgment. The record, in this ease, does not notice any proceeding prior to the indictment, and you might as well allege an informality in the warrant which issued to apprehend the criminal, or in the mittimus by which he was committed.
I am therefore of opinion that the judgment must be entered.
Marshall, .1., concurred in this opinion.
Kilty, C. J., dissented.